IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TYRONE WALLACE,
        **Plaintiff**

        v.

HARLEY G. LAPPIN, Director;
C. MAIORANA, Associate Warden;
and, L. POTTER, Paramedic,

        **Defendants**

CIVIL ACTION NO.: 1:09-CV-1858

# M E M O R A N D U M

This is a *Bivens*-styled[1] civil rights case brought by Plaintiff Tyrone Wallace, *pro se*, a prisoner currently incarcerated in the United States Penitentiary at Lewisburg ("USP-Lewisburg"), for alleged violations of his First and Eighth Amendment rights secured by the United States Constitution. Defendants are officials with the Federal Bureau of Prisons who have been sued in their individual and official capacities. (*See* Doc. 32, Second Am. Compl.) Before the court is Defendants' motion for summary judgment. (Doc. 39.) This motion has been fully briefed and is ready for disposition.

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504 (1978).

I.    **Background**

    A.    **Procedural History**

On September 28, 2009, Plaintiff filed a complaint against more than twenty-five officials from the Federal Bureau of Prisons. (*See* Doc. 1.) On October 7, 2009, Plaintiff was granted leave to proceed without pre-payment of the filing fee and a summons was issued. (Doc. 9.) On October 14, 2009, Plaintiff sent a letter to the court requesting that certain amendments be made to the complaint, but the court refused to accept the amendments as filed. Plaintiff was advised that an "amended complaint must be complete in all respects. It must be a new pleading which stands by itself as an adequate complaint without reference to the complaint already filed." (Doc. 11, Mem. & Order, Oct. 16, 2009 (*citing Young v. Keohane*, 809 F. Supp. 1185, 1198 (M.D. Pa. 1992)).)

By order dated October 16, 2009, Plaintiff was granted leave to amend his complaint by no later than November 2, 2009. (*Id.*) No amended complaint was filed by that date; therefore, on November 9, 2009, the court issued an order stating that the case would proceed on the original complaint. (Doc. 16.)

On November 27, 2009, the court received a motion for reconsideration from Plaintiff in which he requested additional time to file the amended complaint, (Doc. 19), which the court granted by order dated December 1, 2009, (Doc. 20). Plaintiff filed an amended complaint but, in doing so, failed to place the docket number on the complaint and failed to identify the document as an "amended complaint." This filing was given a new docket number (4:09-CV-2210) and assigned to a different judge.

Ultimately, the complaint docketed to number 4:09-CV-2210 was dismissed and on December 30, 2009, Plaintiff filed an amended complaint in the captioned case. (*See* Doc. 22.) The amended complaint was found to be deficient and by memorandum and order dated January 21, 2010, Plaintiff was granted leave to file a second amended complaint by February 3, 2010. (Doc. 27.) Once again, Plaintiff was given detailed instructions and case law on what constitutes an appropriate complaint and an amended complaint. Plaintiff did not file the second amended complaint by February 3, 2010, and, consequently, the case was dismissed. (*See* Doc. 28.)

On March 22, 2010, Plaintiff advised the court that he did not receive the memorandum and order dated January 21, 2010. (Doc. 29.) The action was reinstated and Plaintiff was given to April 15, 2010, to comply with the January 21, 2010 memorandum and order. (Doc. 30.) That order, in addition to previous orders, advised Plaintiff that an amended complaint shall be a new pleading which stands by itself and shall be complete in all respects. (*See id.*)

On April 16, 2010, Plaintiff filed an amended complaint in which he named as Defendants Harley G. Lappin, C. Maiorana, and Paramedic Potter, the captioned parties. (Doc. 32.) After service of process by the United States Marshal's Service, Defendants filed their motion to dismiss or, in the alterative for summary judgment, their statement of material facts, and their brief in support. (Docs. 39-41.) By order dated August 23, 2010, the court granted Plaintiff additional time to respond to Defendants' motion, and put the parties on notice that it would convert Defendants' motion to one seeking summary judgment and would decide it pursuant to Federal Rule of Civil Procedure 56. (Doc. 43.) A paper copy

of this order was mailed to Plaintiff – who had also previously received a paper copy of the court's Standing Case Management Order, which sets out in detail the requirements for opposing summary judgment. (*See* Doc. 5.)

On September 10, 2010, Plaintiff filed his brief in opposition, and his counter-statement of material facts. (Doc. 47-48.) On September 14, 2010, Plaintiff filed a declaration in support of his brief in opposition to Defendants' motion for summary judgment. (Doc. 50.) Defendants filed their reply brief on September 21, 2010. (Doc. 51.) Thus, Defendants' motion is ripe for disposition.

### B. Facts

The following facts are drawn from the parties' statements of material fact, and the exhibits and affidavits attached thereto, and are undisputed except where noted. Plaintiff Tyrone Wallace ("Wallace") was convicted in the United States District Court for the Northern District of Illinois for Possession of Firearm by an Armed Career Criminal.[2] (Doc. 40, Defs.' Statement of Material Facts

---

[2] Throughout the documents submitted by Plaintiff in opposition to summary judgment, Plaintiff repeatedly comments that his arrest was improper and that he was "kidnapped [sic] by an Assistant United States Attorney." (*See e.g.* Doc. 47, Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. at 11 of 49.) Plaintiff provides no evidence that his conviction was invalidated on appeal or called into question by a federal court by issuance of a writ of habeas corpus. Thus, although it is not apparent from the face of his documents, to the extent that Plaintiff challenges the legitimacy of his conviction and continued incarceration those claims are barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), where the Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable

(continued...)

4

("Defs.' SMF") ¶ 1.) Wallace was sentenced to 300 months incarceration with a 5-year term of supervision to follow; he is currently projected for release on April 8, 2024. (*Id.* ¶ 2.)

### 1. **Events Prior to Transfer to USP-Lewisburg**

Immediately prior to his incarceration in USP-Lewisburg, Wallace was incarcerated in United States Penitentiary at Victorville (USP-Victorville) in California. While in USP-Victorville, Wallace was placed in administrative detention and referred for a hearing and possible placement in the Special Management Unit ("SMU"). (*See* Doc. 47 at 36-38 of 49, Admin. Detention Order and Notice of Hearing Referral for Designation to a Special Management Unit, attached as exhibits by Plaintiff to his Br. in Opp'n.) The SMU was implemented to manage and provide additional programming opportunities to inmates who have been involved in, or played a leadership role in, a disruptive incident involving some type of gang activity, or who have been chronic, serious disciplinary problems at previous institutions. (Defs.' SMF ¶ 11.) Wallace's referral noted that he was being referred to the SMU because:

> You have demonstrated poor institutional adjustment and are considered a management problem. You have received twenty-six incident reports, which include: Assaulting Without Serious Injury (x3), and fighting. Your [sic] are the recognized leader of the Security Threat Group Black Gangster Disciples at USP Victorville. You are a disruption to the orderly running of the institution.

---

²(...continued)
under § 1983.

*Id.* at 486-87 (emphasis in original).

(Doc. 47 at 38-39 of 49, Notice to Inmate of Hr'g Referral for Designation to a Special Management Unit.)

### 2. Arrival at USP-Lewisburg

Ultimately, Wallace was transferred to USP-Lewisburg, and arrived there with a bus full of other prisoners on the evening of May 18, 2009. Upon arrival, the incoming inmates were brought into the Receiving and Discharge area of the prison in order to be processed. (Defs.' SMF ¶ 14.) During intake, each inmate was interviewed to determine whether there are any health, security or inmate separatee concerns. (*Id.* ¶ 15.) While in the Receiving and Discharge area inmates remain in restraints. (*Id.* ¶ 16)

On the night that Wallace arrived at USP-Lewisburg, a series of fights broke out in the Receiving and Discharge area after several inmates slipped their restraints and used them to fight with other inmates. (*Id.* ¶ 18.) While trying to quell the disturbance, some USP-Lewisburg staff were assaulted, windows were broken, and other property was destroyed. (*Id.* ¶ 19.) Wallace asserts that there were actually two incidents in the holding cell. First, there was an incident where *one* inmate slipped his restraints and was causing a disturbance. (*See* Doc. 48 at 10 of 22). Plaintiff asserts that this individual was immediately secured and removed from the area. (*Id.*) Second, he states that the other inmates were held for a long period of time and began complaining about hunger, at which point a commotion started and windows were broken. (*Id.*) Wallace denies, without citation to the record, that any staff were assaulted in the Receiving and Discharge area. (*See id.* at 9 of 22.) Thus, except for whether any staff were assaulted, Wallace does not

disagree that these incidents occurred, he simply takes issue with the manner in which they were characterized by Defendants.

At the time these disturbances occurred, there were approximately thirty-five inmates in the holding area. (Defs.' SMF ¶ 20.) All inmates in the holding cell were ordered to lie on the floor and remained in restraints until staff could sort out who was involved in the disturbances. (*Id.* ¶¶ 21-22.) Wallace does not dispute that this occurred, but contends the it was Associate Warden Maiorana who forced everyone to lie on the floor, face down while being watched by guards with guns. (Doc. 48 at 11 of 22.) The process of sorting out who was involved in the disturbances was hampered for two reasons: (1) the evening watch and morning watch shifts were not staffed as heavily as the day watch shift so additional staff, including Defendant Maiorana, had to be called in from their homes to assist with securing the area; and, (2) all of the inmates involved were new designations to USP-Lewisburg and were unfamiliar to the staff, thus, identifying each inmate and matching him with his file was more time consuming. (Defs.' SMF ¶¶ 23-24.) It took a few hours for everyone to be processed, screened, and assigned cells. (*Id.* ¶ 25.) Once in their cells, inmates would have received the next meal scheduled to be served. (*Id.*)

### 3. **Wallace's medical treatment while at USP-Lewisburg**

On May 22, 2009, four days after his arrival, Wallace refused to take his medication in the pill line while being observed by Defendant Potter. (*Id.* ¶ 28.) Defendant Potter noted this refusal in Wallace's medical records. (*See* Doc. 40-2 at 30 of 35, Attach. 1 to Ex. B, Excerpt of Medical Records.) Wallace does not disagree, but states that he refused to take the medication at the time because he was

7

eating an apple, and there was no reason why Potter could not have come back when Wallace was finished or after Potter had finished giving the medication to other inmates. (Doc. 48 at 13-14 of 22.)

Defendant Potter's May 22, 2009 entry in Wallace's medical record was reviewed, approved, and cosigned on May 24, 2009 by then-Clinical Director Anthony Bussanich, M.D., the physician assigned to USP-Lewisburg. (Doc. 40-2 at 30 of 35, Attach. 1 to Ex. B, Excerpt of Medical Records.) On June 3, 2009, USP-Lewisburg's Chief Pharmacist made an entry in Wallace's medical file noting that his psychotrophic medication was discontinued, and that the discontinuance was discussed with institution psychology staff who did not voice any objection. (*See* Doc. 40-2 at 27-28 of 35, Ex. B, Declr. of Kevin Pigos M.D. ("Pigos Declr.") ¶ 4.) The Clinical Director co-signed the note and commented, "Discontinue Mirtazapine." (*Id.*) This note was updated on June 5, 2009 by the Clinical Director who noted that Wallace's medication was discontinued because he was non-complaint. (*Id.*)

On June 30, 2009, USP-Lewisburg's chief pharmacist noted in Wallace's medical records that a request was made through Dr. Pigos, who replaced Dr. Bussanich as the Clinical Director at USP-Lewisburg, to restart Wallace's Mirtazapine, which was the same medication he was previously taking. (Defs.' SMF ¶¶ 34, 36.) Defendant Potter, as a paramedic, cannot independently discontinue or prescribe a medication and played no role in the decision to re-start Wallace's medication. (*Id.* ¶¶ 29, 38.) The medication prescribed to Wallace, Mirtazapine, must be taken by an inmate while observed by staff in order to ensure appropriate compliance with the prescription, and to ensure that an inmate is not

8

hoarding the medication for himself or to give to another inmate for later use as an overdose. (*Id.* 26.)

**II.        Legal Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)*.* Upon such a showing, the burden then shifts to the non-moving party to present "specific facts showing the existence of a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*

*Corp.*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

### III. Discussion

Wallace has sued Harry G. Lappin, Director of the Bureau of Prisons, C. Maiorana, an associate warden at USP-Lewisburg, and L. Potter, a paramedic at USP-Lewisburg. Each Defendant is sued in his official and individual capacity. In their motion, Defendants assert that they are entitled to judgment as to all of Wallace's claims. Specifically, all of Wallace's claims against Defendants in their official capacities are barred by the doctrine of sovereign immunity; Wallace's claims against Defendant Lappin fail because he fails to come forward with facts demonstrating that a conspiracy existed and that Lappin was a part of that conspiracy; and, finally, the undisputed facts demonstrate that Defendants Potter and Maiorana are entitled to judgment as a matter of law. The court will address each of these arguments in turn.

#### A. Sovereign Immunity

Defendants are federal prison officials and, as such, Wallace's constitutional claims are brought pursuant to *Bivens v. Six Unknown Named Agents*

*of the Fed. Bureau of Narcotics,* 403 U.S. 388 (1971). In *Bivens*, the Supreme Court implied a cause of action for damages against federal officials, as individuals, for the violation of constitutional rights. *Id.* at 396.

As Defendants point out in their motion for summary judgment, a plaintiff cannot proceed in a *Bivens* action for damages against the United States for an alleged deprivation of a constitutional right, *see FDIC v. Meyer*, 510 U.S. 471, 484-85 (1994) (finding that *Bivens* claims for damages against a federal agency are barred by the United States' sovereign immunity, absent waiver), or against any of the individual Defendants in their official capacities, *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (a suit against a government officer in his or her official capacity is a suit against the government).

Wallace does not address this issue in his brief in opposition to summary judgment. Upon review of the applicable case law, the court concludes that to the extent Wallace asserts claims for monetary damages against Defendants in their official capacities, those claims are barred by the United States' sovereign immunity. *See Kabakjian v. United States,* 267 F.3d 208, 211 (3d Cir. 2001) (holding that district courts lack jurisdiction to hear claims brought against the United States unless Congress has explicitly waived sovereign immunity); *see also Lewal v. Ali*, 289 F. App'x 515, 516 (3d Cir. 2008) (per curiam) (nonprecedential) (dismissing the plaintiff's Eighth Amendment medical claim against the defendants in their official capacities, observing that "[a]n action against government officials in their official capacities constitutes an action against the United States; and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver"). Accordingly, the court will grant Defendants' motion for

11

summary judgment as to Wallace's claims against Defendants in their official capacities.

### B. Claims against Defendant Lappin

Wallace asserts that Defendant Lappin is responsible for his transfer from USP-Victorville to USP-Lewisburg and that this transfer was done in retaliation for him having filed a lawsuit against Defendant Lappin in the United States District Court for the Central District of California. Wallace asserts that Lappin "conspired with officials to place Plaintiff in segregation without good cause or finding in retaliation cause [sic] Plaintiff exercised his First Amendment Right." (Doc. 32, Second Amend. Compl. at 4 of 12.) Wallace provides no more detail in his papers filed in opposition to summary judgment, he simply reiterates the conclusory allegations that he made in his Second Amended Complaint.

Here, both Plaintiff's Second Amended Complaint and the papers that he submitted in opposition to summary judgment are devoid of facts bearing out the existence of a conspiracy and the role the Defendant Lappin allegedly took to carry out such a conspiracy. This lack of facts is fatal to Wallace's conspiracy claim. There is "a longstanding rule . . . that a mere general allegation . . . [or] averment of conspiracy without alleging the facts which constituted such conspiracy or collusion is a conclusion of law and is insufficient [to state a claim]." *Young v. Kahn*, 926 F.2d 1396, 1405 n. 16 (3d Cir. 1991) (citation omitted, alterations in original). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. Here, Wallace has come forward with no facts suggesting that Lappin conspired

with anyone. Since he would bear the burden of demonstrating the existence of a conspiracy at trial, the court will grant Defendants' motion for summary judgment as to Wallace's conspiracy claims against Lappin.

### C. Claims against Defendant Maiorana

Wallace's claims against Defendant Maiorana concern his alleged treatment upon his arrival at USP-Lewisburg. Specifically, that he was forced to lay on the ground for over 2.5 hours, that he was handcuffed and that he was subjected to "34.5 hours wearing a black box with tight belly chain," and that he was denied food for twenty-seven hours. (*See* Doc. 32, Second Amend. Compl. at 6 of 12; Doc. 47 at 21 of 49, Br. in Opp'n to Mot. for Summ. J.) Wallace asserts that these actions constituted cruel and unusual punishment in violation of his Eighth Amendment rights.

The court notes that Wallace does not specifically allege that Defendant Maiorana used any particular excessive force against him, rather he complains the Maiorana was "angry and upset" by the disturbance at the holding cell and that he was the one who ordered everyone to the floor. (*See* Doc. 47 at 21-22 of 49, Br. in Opp'n to Mot. for Summ. J.) However, Wallace's contention that Maiorana was the one who ordered the inmates to lay on the floor is unsupported by the record. The undisputed facts demonstrate the Maiorana was not at USP-Lewisburg when the fight broke out, rather, he was called in from home to assist staff because of the disturbance caused by the incoming inmates. (*See* Defs.' SMF ¶¶ 21, 23.)

More to the point, however, no reasonable fact finder could conclude, based on Wallace's allegations of mistreatment, that he was deprived of any rights

under the Eighth Amendment. Here, USP-Lewisburg staff were confronted with a holding cell full of inmates who has just arrived at the institution when at least one inmate slipped his restraints and began fighting with other inmates. Because the fight occurred at night, there were fewer staff available to respond. As a result of this situation, all inmates were kept in the holding cell in restraints and told to get on the floor, a precaution that was taken for the benefit of the other inmates and staff.

While this situation no doubt caused Wallace a certain level of discomfort, the actions appear reasonable in light of the circumstances. The Supreme Court has cautioned courts not to jump to conclusions concerning allegations of excessive force, and instead, "the core inquiry is . . . whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley v. Albers,* 475 U.S. 312, 319 (1986). Thus, "unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury." *Id.* at 322.

Here, given the large number of inmates being processed at one time, whose identity and history were unknown to the staff, the decision to have all of the inmates, including Wallace, lie on the floor and wait to be fed while prison officials sorted out the disturbance and processed the inmates was an appropriate way to

14

ensure that the situation remained under control and no staff or inmates were injured. Put simply, there are no genuine issues of material fact supporting an inference that prison officials acted wantonly, in bad faith, or used excessive force.

### D. Claims against Defendant Potter

Finally, Wallace asserts that Defendant Potter was deliberately indifferent to his serious psychological needs when he refused to leave his medication with him while he was eating an apple and subsequently discontinued his medication. The undisputed facts demonstrate that Wallace's claim fails. First, Wallace's allegation that Potter made the ultimate decision to suspend his medication is not supported by the record. Wallace's medical records entry, including the May 22, 2009 entry by Defendant Potter, a paramedic, was reviewed, approved and cosigned on May 24, 2009, by then-Clinical Director Anthony Bussanich, M.D., the physician assigned to USP-Lewisburg. (Doc. 40-2 at 30 of 35, Attach. 1 to Ex. B, Excerpt of Medical Records.) On June 3, 2009, USP-Lewisburg's Chief Pharmacist made an entry in Wallace's medical file noting that his psychotrophic medication was discontinued, and that the discontinuance was discussed with institution psychology staff who did not voice any objection. (*See* Doc. 40-2 at 27-28 of 35, Ex. B, Declr. of Kevin Pigos M.D. ("Pigos Declr.") ¶ 4.) The Clinical Director co-signed the note and commented, "Discontinue Mirtazapine." (*Id.*) This note was updated on June 5, 2009, by the Clinical Director who noted that Wallace's medication was discontinued because he was non-complaint. (*Id.*) Wallace has come forward with no evidence disputing these entries, thus, there is no evidence that Potter was the one responsible for stopping his medication.

Second, there is no evidence that Wallace's medication was changed once it was restarted. Other than his generalized statement that the medication was not as effective, Wallace comes forward with nothing to suggest that Potter or any other prison official changed his medication. In contrast, the prison medical records supplied by Defendants suggest that Wallace was re-prescribed the same medication that he had been taking. On June 30, 2009, USP-Lewisburg's chief pharmacist noted in Wallace's medical records that a request was made through Dr. Pigos to restart Wallace's Mirtazapine, which was the same medication that he was previously taking. (Defs.' SMF ¶¶ 34-36.)

Thus, it is clear that except for the fact that Potter refused to leave the medicine with him while he ate his apple, there is no evidence connecting Potter to the ultimate decision to discontinue or restart Wallace's psychotropic medication. Even if there were, however, it is apparent from the undisputed facts that Wallace cannot succeed on this claim. It is axiomatic that a complaint alleging a doctor "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment." *Estelle v. Gamble,* 429 U.S. 91, 106 (1976). Instead, Wallace has the burden of coming forward with facts establishing "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* Wallace has not come close. At best, he established that his medication was suspended temporarily based on his refusal to comply with medical protocol for taking such medication, and was not based on any motive beyond routine patient care within the confines of the prison's policies. This is not deliberate indifference.

**IV.      Conclusion**

Based on the foregoing, the court concludes that Wallace has come forward with no evidence supporting any of his claims and Defendants are entitled to judgment as a matter of law.  Accordingly, the court will grant Defendant's motion for summary judgment.  An appropriate order follows.


                                                                S/Sylvia H. Rambo
                                                                United States District Judge

Dated:  October 14, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TYRONE WALLACE, :
: 
     **Plaintiff** : CIVIL ACTION NO.: 1:09-CV-1858
:
    v. :
:
HARLEY G. LAPPIN, Director; :
C. MAIORANA, Associate Warden; :
and, L. POTTER, Paramedic, :
:
     **Defendants** :
:

## O R D E R

In accordance with the attached memorandum of law, **IT IS HEREBY ORDERED THAT**:

(1) Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment, (Doc. 39), converted by the court to a motion for summary judgment by order dated August 23, 2010, (Doc. 43), is **GRANTED**; and,

(2) The Clerk of Court shall enter judgment for Defendants and against Plaintiff and close the case.

                                                S/Sylvia H. Rambo
                                                United States District Judge

Dated: October 14, 2010.